NOT DESIGNATED FOR PUBLICATION

No. 120,373

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.W. and M.W.,
Minor Children.

MEMORANDUM OPINION

Appeal from Johnson District court; NEIL B. FOTH, judge. Opinion filed May 10, 2019. Affirmed.

*Richard P. Klein*, of Olathe, for appellant natural mother.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM:  Mother appeals the district court's termination of her parental rights to A.W., born in 2015, and M.W., born in 2013. For the reasons stated below, we affirm.

*Factual and Procedural Background*

In July 2015, the State filed petitions alleging that A.W. and M.W. were children in need of care (CINC). The petitions detailed Mother's long history with law enforcement and the Department for Children and Families (DCF). The State requested that the district court place the children in out-of-home placements because Mother was in jail and it was unclear when she would be released. The children had been staying for about a month with Mother's grandparents but they were unable to care for the children long-term. On July 7, the district court ordered DCF to take custody of A.W. and M.W.

1

In spring 2016, Mother gave birth to a third child, who remained in her custody and was not a part of these proceedings. Sometime between the July 2015 hearing and spring 2016, Mother got out of jail. In February 2016, Mother stipulated that A.W. and M.W. were CINC, and the district court adjudicated the children as CINC.

The district court ordered a 120-day reintegration plan for Mother and the children, who remained in DCF custody. In July 2016, the district court found that reintegration was still a viable goal for the family, but that the children should remain in DCF custody. It extended the reintegration period by 90 days.

In May 2017, Mother stipulated that she had failed to complete the reintegration plan within the prescribed time and that she was unfit. One of the concerns cited about Mother's continuing unfitness was her contact and relationships with dangerous men. The State noted Mother had relationships with two men who had long criminal histories: One had a history of child endangerment, Andrew Prattis, and the other had a history of domestic violence. The district court accepted the stipulation, ordered Mother to have no contact with these two men, and extended Mother's reintegration plan again for another 90 days.

Following that stipulation and extension, KVC updated the reintegration plan to require that Mother:

- Obtain and maintain safe, stable, drug-free housing suitable for her and the children, and notify KVC of any change of residence.
- Allow KVC to complete walkthroughs, including unannounced walkthroughs, of the home.
- Notify KVC before permitting any other person to participate in her visitation with the children, so that KVC may run background checks on those individuals.

- Obtain and maintain stable employment to support herself and the children, and notify KVC of any employment changes.
- Work with Project Eagle to learn parenting skills.
- Complete a psychological evaluation and follow all recommendations and provide necessary releases to let KVC know of Mother's progress.
- Complete a second drug and alcohol assessment and submit to random UAs.
- Participate in visitation as considered appropriate by KVC.

In October 2017, the State moved to terminate Mother's parental rights to A.W. and M.W. In January 2018, the district court held a trial on the State's motion. We summarize that testimony below.

Sarah Ahmad was the State's first witness. Ahmad worked for KVC as a therapeutic case manager and served Mother, A.W., and M.W. from October 2016 through the time of trial. Ahmad addressed Mother's progress on the updated case plan tasks.

Ahmad testified that Mother secured housing and provided a copy of the lease to KVC, but that lease expired on December 6, 2017, and that Mother had not told KVC where she lived after the lease expired. Ahmad believed that Mother was living with her grandparents. According to Ahmad, the grandparents' house was not an appropriate placement because an uncle who also resided there had failed to pass an earlier KVC background check. Mother had failed to provide KVC with proof of employment since October 2017.

Ahmad also testified that Mother failed to make progress with respect to her drug and alcohol use. Mother's drug and alcohol use, and criminal charges resulting from that use, were some of the primary reasons for the original CINC adjudication. Mother's failure to provide clean UAs contributed to her stipulated unfitness at the May 2017

hearing. Mother did not resolve this problem between the May 2017 hearing and the trial. She failed to appear for scheduled UAs on July 15, July 27, August 30, November 4, December 27, January 6, 2018, and January 22. Missed UAs were presumed positive. In October 2017, Mother tested positive for cocaine. In November 2017, she tested positive for marijuana. Although the updated case plan required Mother to undergo a second drug and alcohol assessment, Mother failed to do so. The plan also required Mother to participate in AA meetings; Mother provided KVC proof of attendance up until September 2017, but then stopped.

Mother's continued drug and alcohol use led to several criminal consequences. In October 2017, Mother was convicted of possession of marijuana. In December 2017, Mother was stopped and ticketed for DUI and marijuana possession. As a result, the State moved to revoke Mother's probation in case 15 CR 1299 where she was on probation for identity theft. At the time of the hearing in this case, Mother had outstanding arrest and bench warrants.

Next, Ahmad addressed visitation. After the May 2017 hearing, KVC at first permitted Mother to have only supervised visits with A.W. and M.W. because she had brought Andrew Prattis to visitation. Between May 2017 and September 2017, Mother moved from supervised visits to monitored visits, then to unsupervised full-day visits.

In September 2017, however, the children's foster family reported that the children returned from a visit "unkempt without shoes." A.W. returned without either underwear or a pull-up, and M.W. returned with unexplained bruises. KVC also learned that Father had unauthorized contact with the children during a visit and that Mother was not truthful about her continuing contact with Prattis. Mother had told KVC that she had no contact with Prattis after May 2017, but KVC found out that Mother had filed a request for a protection from abuse (PFA) order against Prattis in July 2017. No PFA was issued because Mother failed to appear for a hearing. Prattis was criminally convicted for the

incident that led to Mother's request for a PFA. As a result, in November 2017, KVC reduced Mother's visitation and she was permitted only once-weekly, supervised two-hour visits at KVC's office.

Ahmad testified that Mother failed to successfully complete the reintegration plan. She cited concerns about Mother's drug and alcohol use, housing stability, and ongoing association with dangerous men. She thought these were the same concerns that prompted Mother to stipulate to unfitness back in May 2017. She believed it was in A.W. and M.W.'s best interests to terminate Mother's parental rights and give the children a sense of permanency. By the time of trial, A.W., age two, and M.W., age four, had been in State custody for more than half of their lives.

Ashley Voyles Sissel, a KVC therapist, testified as well. She served as M.W.'s therapist at several points between March 2016 and the trial. She testified that M.W. had sleep disturbances, aggression issues, and problems with anxiety. She found that many of these issues were attributable to a lack of stability and permanency in M.W.'s life. Sissel testified that stability would "go a long way towards" helping M.W. with his behavioral issues.

Mother testified on her own behalf. She testified that her uncle, whose presence at her grandparents' home was an issue, no longer lived at the home. She had resigned her job several months before but had found a new job and was currently employed. She had attended every scheduled family therapy visit and had told KVC about her change in address in November 2017.

Mother testified that she never used cocaine, but that she had done drugs in her past and did use marijuana. Although she "drank before," she had "been sober throughout this whole time." She believed the positive UA results had been falsified.

5

Mother also testified that she did not intentionally include Father in her visits with the children, as the State alleged. Instead, during one visit, she had taken the children to a restaurant and Father, who worked nearby, happened to be there with coworkers.

The State cross-examined Mother about the July 2017 incident that led to her request for a PFA. She said that Prattis just showed up at her grandparents' home one day while she was there, and that she called the police because she did not want him around her home or her family. When shown a signed, written statement that she had given to the police, she admitted the signature was hers. But she testified that the handwriting on the statement was not hers and that the facts in the statement were not true. She said she pursued a PFA "[t]o establish that [she] was taking the right precautions … towards keeping [her] children and [her] home and [her] family safe." She said she was unaware that the PFA had been dropped, and that she thought she had attended every necessary hearing.

Mother's boyfriend also testified on her behalf. He said KVC had cleared him to participate in Mother's visits with her children, and that her conduct during visits was always appropriate. Neither he nor Mother used drugs. On cross-examination, however, he admitted that he was in the car with Mother when she was pulled over for the DUI in December 2017. He admitted that he was smoking weed in the car but said Mother was not. He admitted that he did not know that police had found marijuana in the driver's side door of the car during the stop.

The district court found that Mother's unfitness had not changed since May 2017, when Mother had stipulated she was unfit and was unlikely to change in the foreseeable future. The district court found that Mother was unfit based on the following statutory factors:

- K.S.A. 2018 Supp. 38-2269(b)(7): failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

- K.S.A. 2018 Supp. 38-2269(b)(8): lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child[ren];

- K.S.A. 2018 Supp. 38-2269(c)(2): failure to maintain regular visitation, contact or communication with the child[ren] or with the custodian of the child[ren];

- K.S.A. 2018 Supp. 38-2269(c)(3): failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home.

The district court noted that Mother has "an emotional illness and an inability to escape abusive relationships." It found that Mother's unfitness was unlikely to change in the foreseeable future. Finally, the district court found it was in A.W. and M.W.'s best interests to terminate Mother's parental rights.

Mother timely appeals.

*Analysis*

After a child has been adjudicated to be a CINC, a district court must make three findings before terminating parental rights. First, it must find clear and convincing evidence that the parent is unfit. K.S.A. 2018 Supp. 38-2269(a). Second, it must find clear and convincing evidence that the parent's unfitness is unlikely to change in the foreseeable future. K.S.A. 2018 Supp. 38-2269(a). Third, it must find that the termination of parental rights is in the child's best interests. K.S.A. 2018 Supp. 38-2269(g)(1).

7

Here, the first question is not at issue because Mother stipulated in May 2017 that she was unfit and she does not challenge that finding on appeal. She challenges only whether her unfitness was unlikely to change in the foreseeable future, and whether termination of her parental rights was in A.W. and M.W.'s best interests.

*Governing Legal Principles*

We begin with some general principles governing proceedings under the Revised Kansas Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq. A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2018 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2018 Supp. 38-2269(a), the State must prove the parent unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2018 Supp. 38-2269(b), (f). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2018 Supp. 38-2269(c). In addition, the State may rely on one or more of 13 statutory presumptions of unfitness outlined in K.S.A. 2018 Supp. 38-2271.

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly

8

probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit.

Having found unfitness, the district court must then determine whether termination of parental rights is "in the best interests of the child." K.S.A. 2018 Supp. 38-2269(g). The district court makes that determination based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116. The best-interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

*Does Clear and Convincing Evidence Support the District Court's Conclusion that Mother's Unfitness was Unlikely to Change?*

Mother first argues that the district court's conclusion that her unfitness was unlikely to change in the foreseeable future was not supported by clear and convincing evidence. The district court found that Mother's unfitness was unlikely to change in the foreseeable future because "the total record in this case, with regard to Mother's performance, indicates that the situation has gotten worse, there continues to be chaos, violence, and convictions, and continued drug use." The district court emphasized that the case began two and a half years ago and that he had given Mother considerable time since the May 2017 finding of unfitness, but even so she failed to make the necessary changes in her life.

9

To review this conclusion, we consider the record in the light most favorable to the State and determine whether a rational fact-finder could find the conclusion "highly probable," i.e. whether the conclusion is supported by clear and convincing evidence. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). When performing this review, we do not reweigh the evidence or reassess the credibility of witnesses. 286 Kan. at 705.

"What is the 'foreseeable future' is to be considered 'from the child's perspective, not the parents', as the time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). Additionally, "the best indicator of future performance is past performance. Accordingly, courts can consider a parent's past history as evidence regarding the reasonable likelihood of any change in parental fitness. [Citation omitted.]." *In re M.A.*, No. 110,069, 2013 WL 6799335, at *6 (Kan. App. 2013) (unpublished opinion).

*Mother's drug problems*

Mother presents three main arguments. First, she argues that "even if [she] had a minor drug problem, it was not a large enough issue to keep her from caring for her children." But we find clear and convincing evidence in the record to the contrary.

From the very beginning, Mother's case plan required her to produce negative UAs and to pursue drug and alcohol treatment. As the district court emphasized, Mother had far longer than the average parent to remedy her unfitness. This case remained pending in the district court for two and a half years. Yet Mother continued to use drugs and to fail to appear for UAs. Between the unfitness stipulation and the trial, Mother failed to appear for nine UAs and had positive results for two. She was convicted of marijuana possession in October 2017, and was stopped for a DUI and ticketed for marijuana possession in December 2017. These decisions triggered additional consequences for Mother. The State

10

moved to revoke Mother's probation in case 15 CR 1299, which charged identity theft; at the time of the hearing in this case, Mother had outstanding arrest and bench warrants.

Not only does Mother's continued drug use show a failure to complete her case plan tasks, it puts Mother at risk of being sent back to jail, leaving her children without caretakers once more. Indeed, the reason A.W. and M.W. were adjudicated to be CINC in the first place was because Mother was in jail and could not care for them. We reject Mother's suggestion that the State has to show a direct causal connection between her drug use and her children's neediness. The issue of Mother's continuing drug problems was highly relevant to the district court's consideration of whether Mother's unfitness was likely to change in the foreseeable future, as her drug use shows her indifference to remedying the conditions which caused the children's' removal. That continued indifference is contrary to the children's' health, safety, and well-being.

*Mother's relationships with dangerous men*

Second, Mother argues that "there was no evidence presented that [Prattis] was a danger to the children and there was no evidence that the children were involved in domestic violence." This oversimplifies the district court's relevant conclusions. The district court was concerned not only about Mother's relationship with that one specific man but also about her pattern of engaging in relationships with dangerous men and allowing them to have contact with the children. The record contains clear and convincing evidence supporting the district court's concern.

Mother framed the July 2017 incident as an example of her protecting her children by seeking a PFA, but she fails to add that her PFA request was dismissed because she failed to appear. Mother also was untruthful about the encounter; she told KVC she had no further contact with Prattis and did not inform KVC about the incident despite the no-contact order the district court issued in May 2017. Finally, Mother allowed the children

11

to have unauthorized contact with Father during one of her unsupervised visits in fall 2017. While the record does not contain much information about Father, the original CINC complaint alleges that Father had previously choked Mother and threw something at her while she was holding M.W. The record also shows that Father did not participate in his reintegration plan and so did not take steps to address this problem. Thus, the record contains clear and convincing evidence that even after stipulating to her unfitness, Mother continued to allow her children to be around dangerous men.

*Mother's custody of her third child*

Third, Mother argues that her ability to maintain custody of her third child throughout this case shows that her "actions and lifestyle were not actually so terrible or so inappropriate" and that "there was an arbitrary standard." Despite some facial appeal to this argument, we do not find it compelling. The record contains no information about Mother's youngest child other than the fact that he was born in 2016 and remained in Mother's custody. The record does not tell us how well Mother was parenting this child or whether he was thriving.

But even if we believe this factor cuts in Mother's favor, we cannot reweigh evidence when reviewing a district court's decision for clear and convincing evidence. *In re B.D.-Y.*, 286 Kan. at 705. The simple fact that Mother retained custody of her youngest child does nothing to counter the other evidence, including Mother's continued drug and alcohol use, the resulting criminal consequences, and her pattern of relationships.

At the time of the termination hearing, A.W. and M.W. had been in State custody for more than half of their lives. Mother was given several extensions of her reintegration plan, causing her case below to continue for two-and-a-half years. Mother's ongoing drug use and run-ins with the police, including citations for DUI and marijuana possession about a month before the termination hearing, provide clear and convincing evidence that

12

Mother's unfitness was unlikely to change in the foreseeable future. As a result, we affirm the district court's conclusion.

*Did the District Court Abuse its Discretion by Finding that Termination of Mother's Rights was in the Children's Best Interests?*

Mother next argues that the district court erred when it concluded that termination of her parental rights was in A.W. and M.W.'s best interests. We review a district court's determination of the children's best interests for abuse of discretion. *In re R.S.*, 50 Kan. App. 2d at 1116. A district court abuses its discretion if it bases its conclusion on an error of fact or law, or if no reasonable person could agree with the court's conclusion. 50 Kan. App. 2d at 1105, Syl. ¶ 2. The party claiming that a district court abused its discretion has the burden to show such an abuse. *In re K.E.*, 294 Kan. 17, 23, 272 P.3d 28 (2012).

Mother argues that "the district court gave no consideration to the physical, mental, or emotional needs of the child and it was an abuse of discretion to find that termination was appropriate." She also argues that "the only credible evidence presented at trial was that it would not be in these children's best interests to terminate their mother's parental rights." We disagree.

At the time of the termination hearing, these children had been in State custody for two-and-a-half years—the majority of their lives. The district court highlighted this fact in its conclusion. The district court also noted Sissel's testimony that Mother's case plan failures caused changes in her visitation rights, and that these visitation changes had a "detrimental emotional impact especially on [M.W.]."

Finally, the district court explicitly stated on the record that it considered the children's best interests:

"Thus, the Court finds that it's in the best interest of the minor children to terminate parental rights and assign the sole right to consent to adopt to the Secretary.

"The Court does that after considering physical, mental, and emotional health of the children and finds that their physical, mental, and emotional needs would be best served by termination."

We take the district court at its word.

Mother fails to show that the district court abused its discretion. The district court stated that it considered the children's best interests. It also cited evidence that the lack of stability had a negative impact on M.W. While the district court made fewer explicit findings with respect to A.W., this is likely due at least in part to A.W.'s young age. She had been removed from Mother's care when five months old and was less than three years old at the time of the termination hearing. The district court did not abuse its discretion by concluding that it was in the children's best interests to achieve stability and finality after two-and-a-half years in State custody.

Affirmed.